J. Gary Gwilliam, Esq. (State Bar No. 33430)
Randall E. Strauss, Esq. (State Bar No. 168363)
Jayme L. Walker, Esq. (State Bar No. 273159)
Angelina M. Austin, Esq. (State Bar No. 336250)
GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
1999 Harrison Street, Suite 1600
Oakland, CA 94612-3528
Telephone: (510) 832-5411
Facsimile: (510) 832-1918
Email: ggwilliam@giccb.com; rstrauss@giccb.com; jwalker@giccb.com; aaustin@giccb.com

Attorneys for Plaintiffs
ESTATE OF FRANK CARSON &
GEORGIA DEFILIPPO

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ESTATE OF FRANK CARSON AND GEORGIA DEFILIPPO, as an individual and as successor in interest to FRANK CARSON,

Plaintiffs,

vs.

COUNTY OF STANISLAUS, CITY OF MODESTO, BIRGIT FLADAGER, MARLISSA FERREIRA, DAVID HARRIS; KIRK BUNCH, STEVE JACOBSON, JON EVERS, CORY BROWN, and DOES 1-25, inclusive,

Defendants.

Case No. 1:20-CV-00747-TLN-BAM

**SECOND AMENDED COMPLAINT FOR DAMAGES**

1. **Violation of Civil Rights/Unlawful Search and Seizure (42 U.S.C. § 1983)**
2. **Violation of Civil Rights /Malicious Prosecution (42 U.S.C. § 1983)**
3. **Violation of Civil Rights /Retaliatory Prosecution (42 U.S.C. § 1983)**
4. **Violation of Civil Rights /Fourteenth Amendment (42 U.S.C. § 1983)**
5. **Violation of Civil Rights/Monell Liability, (42 U.S.C. § 1983)**
6. **Violation of California Civil Code § 52.1**
7. **False Imprisonment/False Arrest**
8. **Wrongful Death**

**DEMAND FOR JURY TRIAL**

## I. INTRODUCTION

1. Plaintiff Frank Carson ("Carson") was a prominent Stanislaus County criminal defense attorney who, for decades, defended people accused of crimes. He was very good at his job. He tried many difficult cases, and many of his clients were found not guilty. Over the years, Mr. Carson had a number of courtroom confrontations with prosecutors and law enforcement officers, who disapproved of his aggressive style. Mr. Carson dealt the Stanislaus County District Attorneys' office a series of high-profile courtroom defeats—which included successfully defending the former Mayor of Modesto—and repeatedly accused prosecutors and other members of local law enforcement of corruption.

2. At the age of 61, Frank Carson was falsely and maliciously arrested and prosecuted for his alleged involvement in the murder of Korey Kaufman, a local petty thief and drug addict. The Defendant law enforcement officials for Stanislaus County – stung by the series of high-profile defeats by Carson – falsely and maliciously concocted a fanciful tale, wherein Carson, concerned about the theft of antiques from his property, resorted to murder for hire. According to law enforcement, Carson enlisted his wife, and stepdaughter, two local small business owners, three CHP officers, and a convicted drug addict, in a scheme to murder Korey Kauffman, a man Carson did not even know.

3. In their zeal to tie Mr. Carson to the disappearance of Korey Kauffman Defendants assembled a large multi-jurisdictional investigation or "task force" that would rival any criminal prosecution in California history. Ostensibly to investigate this missing person—but in reality to effectuate their vendetta against Frank Carson—the task force included members of the Stanislaus County District Attorney's Office, the Stanislaus County Sheriff's Department, the Modesto Police Department, the Turlock Police Department, the Ceres Police Department, and the California Department of Corrections.

4. Many members of the task force had previously expressed ill-will towards Frank Carson, with whom they had repeatedly clashed throughout the years, including Defendant DA Fladager. In 2013, Carson announced that he would run for Stanislaus County District Attorney based in part on his criticism of the overuse of wiretaps and other corruption in the district

attorney's office. Although he lost the election, investigators, in their arrest warrant affidavit, described Carson's campaign as a "contrived and calculated" effort to obstruct their inquiry into Kauffman's disappearance. It only reinforced their single-minded desire to get Carson.

5. On August 14, 2015, Carson was arrested and charged with the murder of Korey Kaufman, on the theory that Kaufman was killed when he allegedly trespassed onto Carson's property to steal some metal pipes. Carson's wife and stepdaughter were also falsely arrested for the murder. There was no evidence to support this preposterous theory. There was no blood, hair, clothing fibers, fingerprints, spit, sweat, or any such thing found on Mr. Carson's property where the Defendants claimed the murder occurred. There was no evidence that Korey Kaufmann was ever on Frank Carson's property, that Kaufmann ever stole anything from Carson, or that Carson had any intent or motive to kill Kaufmann. There was no probable cause to believe Carson had committed any crime and Defendants knew it. Instead, they conspired to create probable cause with fabricated testimony from career criminals who were given deals or leniency in their own criminal charges in exchange for statements against Carson.

6. There were many other, more obvious and viable suspects, including drug dealers, gang members and petty criminals who had threatened to kill or harm Kauffman in the days and months leading up to his disappearance. For example, shortly before Kauffman disappeared, Norteno gang member Rudy Gonzalez had threatened to cut Kauffman's throat from "ear to ear" because Rudy believed Kauffman had stolen from him. Marijuana growers and drug dealers Jason Armstrong and David McMillian were captured on game cameras placed at the location Kauffman's remains were found prior to this information being public. But District Attorney Fladager and Defendants deliberately ignored these suspects and instead used the resources of the multi-agency task force to pin Kauffman's disappearance on their nemesis, Frank Carson.

7. Defendants fabricated substantial evidence to create a case against Carson. The most notable fabrications involved Robert Woody, an associate of Baljit and Daljit Athwal, brothers who owned the Pop N Cork, a convenience store, where Woody helped-out with odd jobs. While high on methamphetamine, Robert Woody made rambling statements to a

girlfriend about Kauffman's disappearance. Woody told her that he had single-handedly killed Kauffman, pulled his teeth out so that the body could not be identified, and that Kauffman's remains had been "fed to the pigs." The Defendants had recovered Kauffman's remains by the time this statement was made. They had incontrovertible evidence that Korey Kauffman's teeth were intact and his remains were not fed to pigs. Yet, the Defendants targeted Woody, ultimately casting him as the star witness to the murder of Kory Kauffman.

8. Despite immense pressure, the Athwals, the three CHP officers, Carson's wife and step-daughter refused to falsely implicate Carson in a murder that he (and they) had nothing to do with. As a result, Carson had to face charges of murder with special circumstances and was incarcerated without bond for more than a year and a half awaiting trial. Carson's wife, Georgia DeFilippo, and his stepdaughter, Christina DeFilippo, were also arrested and charged with murder and accessory to murder respectively. Both women were discharged after the prosecution failed to produce any evidence against them in an 18-month preliminary hearing and the judge found there was not probable cause to charge them with any crimes.

9. During the 18-month long preliminary hearing, one of the longest in California history, a judge ordered Carson released of his own recognizance, an act unheard of for someone charged with murder, because Defendant District Attorney Marlissa Ferreira repeatedly refused to turn over evidence of Carson's innocence. The only reason Carson was held for trial after the preliminary hearing was due to false and fabricated evidence by the Defendants. However, he remained out of custody due to Ferreira's egregious prosecutorial misconduct.

10. On June 28, 2019, after a jury trial that lasted more than a year, the jury acquitted Carson of all charges after less than two days of deliberations. Unfortunately, due to the circumstances of his confinement, Carson suffered deleterious health problems and died on August 12, 2020, as a direct result of the conditions of his imprisonment.

## I. <u>JURISDICTION AND VENUE</u>

11. Pursuant to 28 U.S.C. section 1331, the Court has original jurisdiction over this action because it arises, *inter alia*, under the Constitution and laws of the United States. The

court has supplemental jurisdiction over state law claims.

12. The Court has personal jurisdiction over the defendants because, *inter alia*, they transact business in and engaged in wrongdoing in the District.

13. Pursuant to 28 U.S.C. section 1391(b)(1)-(2), venue is proper because the defendants reside in this District and a substantial part of the events or omissions giving rise to the action occurred in the District.

14. There are several pending related cases: *DeFilippo, et al. v. County of Stanislaus, et al.*, Case No. 1:18-cv-00496- TLN-BAM, *Quintanar v. County of Stanislaus, et al*., Case No. 1:18-cv-01403-TLN-BAM, *Athwal, et al. v. County of Stanislaus et al.*, Case No. 1:15-cv-00311-TLN-BAM, and *Wells et al. v. County of Stanislaus, et al.*, Case No. 1:20-cv-00770-TLN-BAM. All related cases have been consolidated for discovery and case management in the Sacramento Division of the Eastern District.

## II. CONDITIONS PRECEDENT

15. For the state law claims against public entities and employees, Plaintiff timely filed government claims against the COUNTY OF STANISLAUS, CITY OF MODESTO, and their respective employees, on December 20, 2019. The COUNTY OF STANISLAUS rejected the claims on February 20, 2020, and the City of Modesto rejected the claims on January 31, 2020.

16. Plaintiffs sent amended claims to the COUNTY OF STANISLAUS and CITY OF MODESTO on October 12, 2020. Plaintiffs' claim against MODESTO was rejected on November 4, 2020.

## III. PARTIES

17. Plaintiff **ESTATE OF FRANK CARSON** ("Carson") was formed following the death of Frank Carson. The Estate stands in the shoes of Frank Carson and is the successor in interest for Frank Carson. The estate seeks survival damages under state and federal law.

18. Plaintiff **GEORGIA DEFILIPPO** is an individual residing in Stanislaus County and is the widow of Frank Carson, his personal representative and successor in interest. Ms. DeFilippo sues in her individual capacity and seeks survival and wrongful death damages under

federal and state law.

19. Defendant **COUNTY OF STANISLAUS** ("Stanislaus County") is a county, incorporated, duly organized, and existing under the laws of the State of California. Stanislaus County operates under its authority the Stanislaus County District Attorney and Sheriff's Department. Stanislaus County is vicariously liable for defendants Birgit Fladager, David Harris, Marlissa Ferreira, Kirk Bunch, Steve Jacobson, and Cory Brown's wrongful searches, arrest and detention of Plaintiffs, as well as violations of their constitutional rights under California Civil Code section 52.1.

20. Based upon the principles set forth in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), Stanislaus County is liable for the deprivation of Plaintiffs' rights protected by the United States Constitution, as set forth herein. Stanislaus County bears responsibility because its policies, practices, and/or customs caused Plaintiffs' injuries. In particular, Stanislaus County and its officials, including Birgit Fladager and David Harris maintained or permitted one or more of the following official policies, customs, or practices:

a. Failure to provide adequate training and supervision of Stanislaus County District Attorney attorneys and investigators, and Sheriff's Department deputies with respect to the constitutional limits on search, seizure, arrest, and detention;

b. Failure to adequately discipline or retrain employees involved in misconduct;

c. Selection, retention, and assignation of employees with demonstrable propensities for violation of constitutional rights;

d. Condonation and encouragement of employees in the belief that they can violate the rights of persons such as Plaintiffs with impunity, and that such misconduct will not adversely affect their opportunities for promotion and other employment benefits; and

e. Ratification at the highest levels of authority of the specific unconstitutional acts alleged herein.

21. Defendant **CITY OF MODESTO** is a municipal entity with the capacity to sue

and be sued. It is a Charter City under the laws of the State of California. The city operates under its authority the Modesto Police Department. The City of Modesto is vicariously liable for defendant Jon Evers' unconstitutional conduct, including but not limited to involvement in the wrongful search, arrest and detention of Plaintiff, as well as violations of his constitutional rights under California Civil Code section 52.1.

22. Defendants **BIRGIT FLADAGER** and **DAVID HARRIS** were final policymakers for the Stanislaus County District Attorney's Office and the County of Stanislaus and ratified the unconstitutional actions of their subordinates with knowledge of their unconstitutional conduct. They committed the acts complained of herein while acting within the course and scope of their official duties. They are sued in both their individual and official capacities.

23. **MARLISSA FERREIRA**, **KIRK BUNCH**, and **STEVE JACOBSON**, are and were at all relevant times employed by the County of Stanislaus District Attorney and committed the acts complained of herein while acting within the course and scope of their duties. They are sued in their individual capacities.

24. Defendant **CORY BROWN** is and was at all relevant times employed by the County of Stanislaus Sheriff's Department and committed the acts complained of herein while acting within the course and scope of his duties. He is sued in his individual capacity.

25. Defendant **JON EVERS** is and was at all relevant times employed by the City of Modesto Police Department and committed the acts complained of herein while acting within the course and scope of his duties. He is sued in his individual capacity.

26. Plaintiffs are informed and believe, and thereon allege that each defendant is, and at all times mentioned herein was, the agent, employee, representative, successor, and/or assignee of each other defendant. Each defendant, in doing the acts or in omitting to act, as alleged herein, was acting within the scope of his or her actual and apparent authority, or the alleged acts and omissions of each defendant as agent were subsequently ratified and adopted by each other defendant as principal. Plaintiffs are informed and believe that each of the individual defendants was in some way responsible for the constitutional violations and torts

herein alleged.

27. Plaintiffs are ignorant of the true names and capacities of the defendants sued herein as Does 1-25, inclusive, and therefore sue these defendants by such fictitious names and capacities. Plaintiffs are informed and believe, and on that basis allege, that each defendant sued under such fictitious names is in some manner responsible for the occurrences herein alleged, and that their injuries as herein alleged were proximately caused by the conduct of such defendants.

## IV. FACTUAL SUMMARY

### A CONSPIRACY IS BORN

28. This case stems from an outlandish conspiracy contrived by the Defendants — in spite of substantial evidence to the contrary — to have prominent criminal defense attorney, Frank Carson, convicted for murder. Carson had actively worked to expose corruption within the ranks of Stanislaus County law enforcement for decades. He was an extremely successful attorney, especially in cross-examining dishonest police officers and investigators, and had several high-profile verdicts in his favor against the Stanislaus County DA's Office. As a result of Carson's success, he was reviled by many in law enforcement, especially in the Stanislaus County District Attorney's office.

29. Each of the Defendants were motivated to maliciously prosecute and falsely arrest Frank Carson because he had publicly embarrassed law enforcement and prosecutors in Stanislaus County. In addition to several courtroom defeats, Carson ran against incumbent Defendant **FLADAGER** for Stanislaus DA, publicly accusing her of abuse of power and misconduct. Carson had written a complaint to the California State Bar detailing misconduct by Defendant **HARRIS**. Carson had filed multiple declarations in state and federal court, accusing Defendant **BUNCH** of being unethical and a liar. Carson had filed a civil lawsuit against Defendant **JACOBSON** for assault, participated in a jury tampering hearing against JACOBSON, and ran an ad in the local newspaper accusing Jacobson of misconduct.

30. On March 29, 2012, Korey Kauffman's stepfather, Kevin Pickett, recorded on his daily planner that Kauffman had not returned home. On April 2, 2012, Pickett reported

Kaufman missing to the Turlock Police Department. Two days later, on April 4, 2012, Defendant **KIRK BUNCH** filed a report that he claimed was based on information from a Turlock Police Department officer with whom Defendant BUNCH had worked in the past. The conversation purportedly concerned statements from an informant, Michael Cooley, a career criminal and drug addict, who was the last person to see Kauffman alive. Cooley lived on the property directly behind another property owned by Frank Carson. Carson had long suspected that Cooley and his family were involved in multiple thefts from his property.

31. According to **BUNCH**, Cooley sought to implicate Carson in Kauffman's disappearance and subsequent murder — a murder Cooley may have in fact committed. Defendant BUNCH did not record the conversation he claimed to have with Cooley and destroyed any notes from the conversation. Defendant BUNCH and others omitted from search and arrest warrant applications this information about lacking or destroying records of this early and important purported conversation. BUNCH immediately reported Carson's connection to the Cooley property to Defendant **HARRIS**. Suddenly, the DA's Office became very interested in this missing person case and a conspiracy to destroy Carson was born.

32. Frank Carson and his wife, Georgia DeFilippo, had a hobby of collecting and selling antiques. They owned two properties in Turlock, California, where they stored many of their antiques. Carson's stepdaughter, Christina DeFilippo, was living in one of the properties in Turlock where antiques were stored. At an antique fair, Frank and Georgia saw their belongings being sold by another antique dealer and learned they were being robbed. Upon investigation of their property, they discovered a hole in the fence and a beaten path from the open container to an adjacent home rented by Michael Cooley. They asked Christina to keep an eye on the field, and in or about February 2011, Christina noticed that a lock on an outdoor container had been broken and the door was open. Christina notified her mother and stepfather of this. The Carson family contacted law enforcement to report the thefts and the obvious evidence of the Cooley family's involvement, but they were told that nothing could be done unless Cooley was seen with their property.

33. Thereafter, **FRANK CARSON**, and his wife **GEORGIA DEFILIPPO**, and

stepdaughter, Christina DeFilippo took steps to prevent additional thefts of their property. They left lights on in the house and installed a motion detector, with Christina notifying Carson and Georgia if the motion detector was activated. Carson also repaired sheds and locks to bolster security. Carson created a stolen book alert, to give to book dealers in the area in the hopes that someone would call the Sheriff's Department and report if his stolen books were presented for purchase. The stolen book alert contained a list of the people who lived in the Cooley household, the books and other antiques that were stolen, a description of the Cooley's vehicle, Carson's phone numbers, and the Sheriff's Department's phone number, along with the report number. Contrary to lies told to the court and the public by Stanislaus County Deputy District Attorney Defendant **MARLISSA FERREIRA**, Korey Kauffman was not included on this list as a suspected thief. Indeed, there was never any evidence that Carson, Georgia, or Christina even knew Kauffman. Rather, Korey Kauffman was an associate of the Cooley family and made his living by stealing things and recycling them for money.

**FRAMING FRANK CARSON**

34. Shortly after Kauffman was reported missing in April 2012, District Attorney Defendant **BIRGIT FLADAGER** and Chief Deputy District Attorney Defendant **DAVID HARRIS** convened a task force for the purpose of investigating the Kaufman disappearance, but specifically for investigating Frank Carson. Defendants **BUNCH** and **JACOBSON**, investigators with the DA's Office, primarily led the investigation, but the DA's office used several other Stanislaus County law enforcement agencies and federal funds designated for fighting gang violence in order to frame Frank Carson for murder. It was highly unusual for the District Attorney's office to lead an investigation into a missing person, yet at the mere mention of Frank Carson's name the District Attorney's office became the lead investigating agency on the case.

35. Defendant **KIRK BUNCH** was the lead investigator. Carson had previously exposed Bunch's corruption and dishonesty when BUNCH was involved as an investigator in a political vendetta against the former mayor of Modesto, Carmen Sabatino, who was charged with crimes by the DA's Office in the early 2000s. Carson represented Sabatino and wrote

declarations in state and federal court exposing Defendant BUNCH for dishonesty and accusing him of intimidating witnesses in the case. Defendant BUNCH had a long history of corruption and Defendants **FLADAGER**, **HARRIS** and **FERREIRA** knew or should have known that he was unfit to be in law enforcement. There was Brady material on **BUNCH** that a physician in a worker's comp case said that BUNCH had "manipulated and deceived him" and he did not believe BUNCH should work as an investigator.

36. Defendant **STEVE JACOBSON** was also involved in the malicious investigation. Jacobson has a long history of animosity against Frank Carson and has repeatedly been exposed as a liar by Carson in court. Prior to Carson's arrest, Defendant JACOBSON assaulted Carson at the courthouse and Carson sued him. The civil case was pending during the investigation.

37. Defendant **FLADAGER** supervised Defendants **DAVID HARRIS** and Defendant **MARLISSA FERREIRA** as well as **BUNCH** and **JACOBSON**. From the inception of the investigation in 2012, Defendant **HARRIS** also supervised Defendants **BROWN**, **BUNCH**, **EVERS**, and **JACOBSON** on the Carson investigation. In or around 2015, when HARRIS was accused of jury tampering and contempt of court in a case he had with Carson as defense counsel, Defendant **MARLISSA FERREIRA** took over as the supervisor of the investigation and of the investigators working the case.

38. In the course of investigating the case starting in April 2012, Defendant **BUNCH** and other officers were informed by numerous parties that a number of individuals had threatened or attempted to kill Korey Kauffman in the days before his disappearance. Defendant **BUNCH** and other officials disregarded these viable suspects and instead proceeded to focus extensive resources on investigating, arresting, and prosecuting Frank Carson without probable cause. Among the viable suspects that investigators never seriously pursued were the following:

a. Michael Cooley: Cooley was a felon and a known drug dealer with ties to white supremacist gangs. He was the last person to see Kauffman alive, had an argument with Kauffman prior to Kauffman going missing, and had previously threatened

Kauffman. ***He confessed to a witness that he killed Kauffman and said, "that's what he gets for messing with our money."*** Charlie Odell reported to **BUNCH** that he encountered Cooley after Cooley had disposed of Kauffman's body. Odell submitted to a computer voice stress analyzer that indicated he was being truthful. It was known at this time that Cooley was selling drugs out of his residence, in particular crystal methamphetamine, and that Kauffman was a crystal methamphetamine addict. Cooley also buried Kauffman's bicycle in his backyard after Kaufman disappeared. A polygraph test showed Cooley was being "deceptive" about his involvement in the Kauffman murder. Yet, he was never seriously pursued as a suspect because he had no connection to Carson.

b. Rudy Gonzalez: It is undisputed that Gonzalez had a dispute with Kauffman over a scrapping deal. ***48 hours before Kauffman was reported missing***, Gonzalez attempted to run Kauffman over with his car in front of witnesses and then ***threatened to cut Kauffman's throat*** "***from ear to ear***." Gonzalez told investigators he was "probably home" the night Kauffman was last seen but investigators did not confirm this weak alibi and never seriously pursued this individual because he had no connection to Carson.

c. Jason Armstrong: Armstrong had known ties to the Hells Angels. He disliked Kauffman and called him a "fucking tweaker," "fucking dirtball," and "piece of shit." Armstrong said, "Nobody liked Korey [Kauffman]." Armstrong also believed that Kauffman stole tools from a friend's business on East Avenue in Turlock. Another individual was brutally beaten by Armstrong and his friends because they suspected he had assisted Kauffman with stealing the tools. Moreover, Armstrong had a home where he threw frequent parties a few miles away from where Kauffman disappeared in 2012 and admitted to frequenting the area where Kauffman's body was found. **Game cameras placed David McMillan and Armstrong at the location where Kauffman's body was discovered** before information about the location was released to the public. Even though Armstrong told an investigator,

"Didn't Korey Kauffman get shot" before that information had been released to the public, he was not seriously pursued as a suspect because he had no connection to Carson.

d.  David McMillan: Game cameras placed McMillan and Armstrong at the location where Kauffman's body was discovered before information about the location was released to the public.  McMillan said he did not know Kauffman but the results of his polygraph examination did not confirm he was being truthful.  After the polygraph examination, McMillan was identified as possible witness or person of interest in an investigative report dated September 11, 2015.  Yet, he was not seriously pursued as a suspect because he had no connection to Carson.

e.  Bobby Tickner: Tickner is an associate of Armstrong and McMillian.  Tickner had a large illegal marijuana farm in the Stanislaus Forest near the location where Kauffman's remains were discovered.  He was rumored to have moved Kauffman's body in his white pick-up truck.  Tickner admitted to law enforcement that he visited the Stanislaus Forest around the time Kauffman disappeared.  Although Tickner agreed to wear a wire to gather information on Cooley, Armstrong, and others, the Defendants did not follow-up and he was not seriously pursued as a suspect or informant because he had no connection to Carson.

f.  Brandon Starr: Starr was a Northern Ryder gang member who was involved in "gang banging."  Starr had a dispute with Kauffman over a stolen Indian antique motorcycle.  A witness claimed that Starr killed Kauffman because Kauffman stole Starr's Indian antique motorcycle.  Starr said what happened to Kauffman was "Ryder business."  After Kauffman went missing, Starr fled to New Mexico.  Yet, he was not seriously pursued as a suspect because he had no connection to Carson.

g.  Teofilo Ramos: Ramos was a known violent Norteño gang member.  He is also Rudy Gonzalez's, another viable suspect's son.  Investigators learned that Ramos had a dispute with Kauffman at Al's Billiards before his disappearance and was

looking for Kauffman.  Yet, he was not seriously pursued as a suspect because he had no connection to Carson.

h.  Luis Garcia: Garcia was another known violent Norteño gang member.  Garcia also had a dispute with Kauffman at Al's Billiards before his disappearance and was looking for Kauffman.  Garcia was overheard saying "Korey was a pain in the ass to hide."  Investigators knew about this, but Garcia was not seriously pursued as a suspect because he had no connection to Carson.

i.  Tina Carlos: An officer reported to investigators that Kaufman was stabbed while attempting to steal marijuana with friends.  A witness heard that Kauffman was stabbed at Carlos' home while trying to steal marijuana and buried in Carlos' backyard.  This witness submitted to a voice stress test analyzer that indicated the witness was being truthful.  Four other witnesses reported a suspicious van with two passengers and a black bag containing a possible body inside the City of Ceres.  Carlos matched the physical description of one of the passengers.  Yet, she was not seriously pursued as a suspect because she had no connection to Carson.

j.  Tony Onate: Onate was an active Norteño gang member and Carlos' boyfriend.  A witness told investigators that Onate buried Kauffman in Carlos' backyard.  Four witnesses reported a suspicious van with two passengers and a black bag containing a body inside the City of Ceres.  Onate matched the physical description of one of the passengers.  Yet, he was not seriously pursued as a suspect because he had no connection to Carson.

k.  Michael Beede: Beede had a dispute with a Kauffman over drugs, money, or stolen scrap metal before Kaufman disappeared.  Beede had a history of violence and had stabbed someone over a dispute involving marijuana a few weeks after investigators believed Kaufman was killed.  There was evidence that Kauffman called Beede's girlfriend, Anna Yarborough, the night Kauffman went missing.  Yarborough told **EVERS** that Beede had her cell phone that night.  Yet, he was not seriously pursued as a suspect because he had no connection to Carson.

l.   Victor Altamirano: According to Confidential Informant 14-1, Cooley witnessed the killing of Kauffman in his own backyard and showed Confidential Informant 14-1 the exact location in the backyard where Kauffman was killed.  Cooley would not tell Confidential Informant 14-1 who killed Kauffman but told Confidential Information 14-1 to stay away from Starr and Altamirano.  Yet, Altamirano was not seriously pursued as a suspect because he had no connection to Carson.

m.   Eduardo Carbajal: Confidential Informant 14-2 told investigators that Carbajal knew who killed Kauffman, but it appears that investigators did not follow up because he had no connection to Carson.

n.   Hector Lopez: Confidential Informant 14-2 told investigators that Lopez knew who killed Kauffman, but it appears that investigators did not follow up because he had no connection to Carson.

39.     Despite the fact that known criminals and gang members unrelated to Frank Carson had made threats to harm or kill against Kauffman, Defendants ignored that evidence and instead conspired to frame Frank Carson for murder.  Defendants obtained wiretaps for Carson, they surveilled him and his place of business, they obtained search warrants for his vehicles, homes, and cell phone records.  Yet they did none of this for any of these more obvious suspects because they lacked a connection to Frank Carson.  Simply, if there was no connection to Carson, Defendants were not interested.

40.     Korey Kauffman's body was found in a remote area of the Stanislaus National Forest, more than a year after he disappeared, on August 19, 2013.  His body had been ravaged by animals and what was left of it was found scattered on the forest floor.  An autopsy was unable to determine any cause of death.

41.     Prior to the time the location where the body was found was made public, Defendants **KIRK BUNCH** set up game cameras to watch the area.  The cameras revealed that two marijuana growers and dealers, David McMillan and Jason Armstrong, were in the area where the body was found, before that information was made public.  Michael Cooley had accused these same two dealers of murdering Kauffman for stealing marijuana from them and

Defendants knew that they had made threats against Kauffman prior to his disappearance. Defendants **BUNCH** and **EVERS** interviewed McMillan on January 31, 2014 and Armstrong on December 29 and December 30, 2014. McMillan asked the Defendants why they were even investigating this case and said that Kauffman was a "piece of shit thief." The Defendants knew that Armstrong and McMillan were heard talking about where Korey Kaufman was buried before that information was public. Defendant **BUNCH** destroyed the evidence on the game cameras showing McMillan was in the area where the body was found. Defendants entirely ignored McMillan and Armstrong as suspects and continued to go after Frank Carson.

42. In November 2013, Frank Carson was fed up with corruption in the DA's Office and announced that he was going to run against Defendant **BIRGIT FLADAGER**. Following this challenge to her election, **DA FLADAGER** became even more motivated to frame Carson for murder.

**PROCURING WOODY'S FALSE CONFESSION**

43. On February 18, 2014, Robert Woody, an employee of the Pop N Cork, a convenience store owned by the brothers Baljit Athwal and Daljit Athwal, was recorded on a wire bragging to a young woman that he alone had killed Korey Kauffman, cut him up and fed him to pigs. Woody and the young woman, Miranda Dykes, were smoking meth together when Woody in a delusional state made these crazy comments to try to impress Ms. Dykes. Defendants knew that what Woody was claiming did not match the physical evidence of the crime. Ms. Dykes cooperated with Defendants on a promise of getting her kids back from CPS, but she later adamantly told Defendants that she did not think Woody had anything to do with the murder.

44. On February 26, 2014, Defendant **BUNCH** interviewed Robert Branco, a nephew of Robert Woody, and sought to impress on him the theory that Frank Carson and the Athwals were implicated in Kauffman's murder. Defendant Bunch also suggested to Branco that Branco had not learned this story in the course of the interrogation but instead must have learned it earlier, in what appears to be an effort to create corroborating witness testimony for this theory from whole cloth.

45. Woody was arrested March 1, 2014. During the 7-hour interrogation with Defendants **BUNCH, JACOBSON**, and **JON EVERS** of the Modesto Police Department, through their questions, Defendants recited their theory implicating Carson in Kauffman's murder. Despite enormous pressure put on Woody late into the evening and after midnight, Woody repeatedly denied any involvement in, or knowledge of, the Kauffman murder and could not identify Kauffman from a photograph.

46. Ignoring his numerous emphatic denials, **BUNCH, EVERS**, and **JACOBSON** kept badgering Woody. They threatened him with life imprisonment and the death penalty; they told him he might never see his family again and that his ailing mother would die before he was released from prison. The following quoted words are actual statements made by the Defendant **BUNCH** during the lengthy interrogation of Woody on March 1, 2014.

a) "They're all going to be pointing their fingers at you." (March 1, 2014, 27424.)

b) "This is the golden opportunity" to implicate others. (*Id*., 27430.)

c) Told Woody he is facing "life in prison." (*Id*., 27465.)

d) Told Woody that the crime involved "lying in wait with special circumstances." (*Id*., 27424.)

e) "We can go for the death penalty." (*Id*., 27424.)

f) Told Woody that people in Woody's situation "spend the rest of their life in prison." (*Id*., 27465.)

Upon information and belief, **EVERS AND JACOBSON** were present when these statements were made **and knew that these statements were designed to fabricate evidence against Frank Carson and the Athwal brothers**. Defendant **EVERS** also commented that this was Woody's "golden opportunity" to implicate others in the Kauffman murder. Any reasonable police investigator would know that such statements would be very threatening to any rational person and could (and in this case, did) lead to false assertions by Woody in order to avoid harsh penalties, including the death penalty.

47. Defendants **JACOBSON, BUNCH** and **EVERS** coerced Woody to fabricate evidence knowing full well it was false. The interrogation recording has a 20-minute-long gap

in which Woody is said to be going to the bathroom. **Defendants BUNCH AND JACOBSON accompanied Woody and coerced him to falsely accuse his employers, the Athwals, and Frank Carson of being involved in the murder of Kauffman in exchange for leniency in any charges against him. *It was only after this unrecorded "bathroom break" that Woody began to repeat part of what he was told***. When Woody returned from the bathroom, he repeated to Defendants **BUNCH, JACOBSON,** and **EVERS** the theory that they laid out for him: that his employers, Baljit Athwal and Daljit Athwal had murdered Kauffman and that they did it because they were asked by Carson to watch over his property for thieves. **EVERS** was complicit in obtaining Woody's false confession because he was fully aware that Defendants Bunch and Jacobson had pressured Woody to repeat law enforcements false narrative during the "bathroom break."

48. Later, Woody also told Defendants that Kauffman's body was taken from Carson's property and buried at the Pop N Cork liquor store, a mere fourteen (14) inches underground, until it was dug up a month later and taken by Baljit Athwal to the mountains. The burial at the Pop N Cork allegedly occurred in a crowded neighborhood with no witnesses, and where numerous law enforcement frequented, yet no one so much as smelled a decomposing body that was a mere fourteen (14) inches underground right behind the backroom where law enforcement regularly gathered to drink after their shifts. No reasonable law enforcement officer would have believed that Woody's statement established probable cause to arrest Carson, or anyone else, especially when the physical evidence did not support it.

49. In addition to purposely intimidating Woody and leading him to believe that unless he "cooperated" he would face the death penalty, investigators scripted what they wanted him to say. Instead of allowing the alleged wrongdoer to tell them what happened, they fed him the information that they needed to go after Carson and his alleged enforcers, the Athwals and then told him all he had to do was back up this concocted story and they would take care of him. The following quoted words are actual statements made to Woody during several interrogations over the course of almost two years:

**MARCH 1, 2014, INTERROGATION WITH DEFENDANTS BUNCH, JACOBSON, AND EVERS**

a) **Defendant Bunch**: "Prior to the murder . . . you guys were talking in front of him, okay, about Frank's property and how you were instructed to go find Korey Kauffman, okay, to make an example out of him."  (March 1, 2014, 27418-27419.)

b) **Defendant Bunch**: "You're gonna be the one who's gonna be doing the right thing and who had probably the least involvement in saying that you were there, okay, and there were some hits that were thrown, not necessarily were gonna kill him but it just happened, okay."  (*Id.*, 27423.)

c) **Defendant Bunch**: "I don't believe that you meant – that you knew he was gonna be murdered."  (*Id.*, 27439.)

d) **Defendant Bunch**: "Everybody had their involvement.  Everybody played a role, okay, and that's what needs to be told."  (*Id.*, 27439.)

e) **Defendant Evers**: "You were involved or at least witnessed the murder."  (*Id.*, 27458.)

f) **Defendant Jacobson**: "You perhaps witnessed this but that you didn't actually hurt this guy, you were actually like what your mom said, the guy who went to help Korey and you tried to pull this Bobby guy off."  (*Id.*, 27476.)

g) **Defendant Bunch**: "I mean – I'm sorry – even if you did thumped on him doesn't mean you killed him."  (*Id.*, 26223.)

h) **Defendant Bunch**: "Well me being a smart guy and operating off of common sense, okay, making reference to the murder that happened two months prior.  Okay?  'Stay off the property.  What happens to Frank, happens to me.'  Those are the key points that were said afterwards, but we're interested in your confession, okay, about your involvement with the murder.  Okay?  That's what we're interested in.  Okay . . . I'm trying to show you the light.  This is your golden opportunity."  (*Id.*, 27505.)

i) **Defendant Bunch**: "Baljit and Daljit were supposed to make an example for her, uh, Frank.  Frank wanted – I mean pretty much was going on is they weren't gonna call law

enforcement. Okay? They're – they were supposed to make an example. Because if they made an example of somebody the thefts would stop." (*Id.*, 27652).

j) **Defendant Evers**: "So you know as truth Baljit – Bobby – and Dee are responsible for the death of Korey Kauffman, right?" (*Id.*, 27656.)

**MARCH 3, 2014 INTERROGATION WITH DEFENDANTS BUNCH AND EVERS**

k) **Defendant Bunch**: "We'll make it better. Hey, all you're going to see is we're rolling the ball for you. . . . We need more stuff that can help us help you. All right?" (March 3, 2014, 27:3-4 and 27:25-26.)

l) **Defendant Bunch**: "Now I just want to tell you the DA is on board, okay, working with you. All right? Because there's other people involved in this whole thing. And so we're trying to get – all squeeze out all the information. Because if you squeeze out all information, this is going to be better for you. Okay? Because the DA wants to use you pretty much as like a kind of a witness . . . The DA is, I'm telling you, wants to work with you . . . And then what happens is the court – when the court comes up, the DA will talk to the court, your attorney, and work out a formal deal with you." (March, 3, 2014, 32551-552.)

**MARCH 14, 2014 INTERROGATION WITH DEFENDANTS JACOBSON**

m) **Defendant Jacobson**: "And when you do tell the truth it can help you, and it can take you out of this situation that you're in and put you in a situation that is a lot more favorable for Robert Woody, and not go down for other people's misdeeds and not to be alone and be prosecutor by yourself at the table. Do you understand that?" (March 14, 2014, 30415-30416.)

n) **Defendant Jacobson**: "And so now these guys have basically done vigilante justice to kill somebody who stole from them and it would be like people at Walmart grabbing you mom and saying, 'you know what? You know deserve to die instead of your one year in the county jail for stealing video's now it's the death penalty.'" (*Id.*, 30423-30424.)

o) **Defendant Jacobson**: "The whole truth you're gonna go away for just (unintelligible) . . . You're never going to get to see your kids again except in visits when they come visit you in prison . . . You'll – you'll never – you'll never see your or you'll never be able to spend time with your mom and your dad. With your mom's health conditions, you may not even – you may not

even be able to be around her to comfort her when she needs you the most . . . And that's – and that's where we're coming from Robert." (*Id.*, 30406.)

p) **Defendant Jacobson**: "Because there's four people that are prime suspects in this case. You, Bobby, Dee, and Frank. . . . And you're the on – you're the only one that's in custody right now because of how the evidence is being played out . . . I guarantee that it took more than one person to do this. I guarantee that." (*Id.*, 30412.)

q) **Defendant Jacobson**: "They'll teach you a lesson and it's a lesson that they teach other people by how they treat you as well. They'll take you out. That's why you're where you're at." (*Id.*, 30425.)

r) **Defendant Jacobson**: "You're not the monster but you know who the monster is." (*Id.*, 30419.)

**AUGUST 14, 2015 INTERROGATION WITH DEFENDANT JACOBSON AND CALIFORNIA HIGHWAY PATROL SERGEANT KEVIN DOMBY**

s) **Defendant Jacobson**: After telling Woody that he has a chance to talk to the Deputy District Attorney: "And I hope that you believe that you're in a position that you can help us as well as help yourself." (August 14, 2015, 28516.)

v) Sergeant Domby: "We're both here to help you." (*Id.*, 28604.)

w) Sergeant Domby: "You're the one that had the Chief Deputy DA – had Marlisa talking to you saying, 'I've been trying to help here with you being able to tell what happened.'" (*Id.*, 28698.)

x) **Defendant Jacobson**: "It was daylight, in the BMW, right in front of Korey's house. The neighbor was across the street and outside and heard this. Identified the black BMW. Identified you and identified an Indian male in the vehicle as well. And we all know it was Daljit's BMW." (*Id.*, 28561.)

y) **Defendant Jacobson**: "But the neighbor says she heard a male from the vehicle say, 'Your ass is grass,' and the vehicle drives away. And then the neighbor describes this black BMW with an Indian male driver and a white guy. And another person says, 'Yeah, that was

Robert Woody.' And the Indian male they're kind of unknown as to which one it was, whether it was Baljit or Daljit." (*Id.*, 28562.)

z) Sergeant Domby: "They looked at you as somebody they could use for whatever they needed to do, whether it was to drive by, um, Korey's house and yell out the window. 'Woody, will go. Get in the car. Let's go. Let's go do this.' Right?" (*Id.*, 28634.)

a) Sergeant Domby: "Those details are important because details let us know that you're telling the truth. When they match up with the details we have, right? That's what I told you about the cellphones. . . . There are some details that I'm absolutely right about. That's why I shared with you the stuff about the CHP sergeants." (*Id.*, 28650-51.)

ab) Sergeant Domby: "We're talking about Bobby hitting Korey in the back of the head, in the ribs . . . . Okay, with his fists, right? Not with another weapon." (*Id.*, 28657.)

ac) **Defendant Jacobson**: "Although there may be some doubt as to what you actually did at Frank's property, it seems pretty clear that the common denominator between everybody and even it coming out of your own mouth with Sunny is that you cleaned up. You know you – you helped them in some manner or some shape – some form or – of another to – to help clean up this situation." (*Id.*, 28713).

ad) **Defendant Jacobson**: "I mean, this was – Baljit and Daljit were saying this was going to make uncle Frank proud and – and it was going to, you know, this was what they wanted to do for him?" (*Id.*, 28776.)

ae) Sergeant Domby: "It certainly you got a sense that they felt the beating that they were delivering to Korey was going to make Frank happy?" (*Id.*, 28777.)

af) Sergeant Domby and Investigator Jacobson suggest that Dee fired with a small caliber handgun, like a .22 (*Id.*, 28686-28687.)

ag) Robert Woody said that he didn't see any weapons, after which the following exchange occurs:

Sergeant Domby: "You didn't see a weapon but that doesn't mean there wasn't one. Uh, and then as they walk away or as you walk away you hear the sound."

Woody: "Yes."

Sergeant Domby: “That could’ve been a gunshot.” (*Id.*, 28691.)

**OCTOBER 6, 2015 INTERROGATION WITH DEFENDANT JACOBSON**

ag) **Defendant Jacobson**: “It just is not making sense. Bobby had already been on the property. Bobby had been in the backyard. Bobby had been through the pedestrian gate. He knew what the property looked like. Bobby had pulled guard duty on the property, obviously . . . catching Korey.” (October 6, 2015, 27934.)

ah) **Defendant Jacobson**: “So, she said that she’s walking down the road. And she sees you as a passenger in the car. She sees an Indian male driving. It’s Dee’s BMW. And she sees you guys driving by. And Korey – Korey walks up to her at – at that period of time right after this threat is made.” (*Id.*, 27942.)

ai) **Defendant Jacobson**: “The car doesn’t make an abrupt stop? It doesn’t injure your neck? You’re not rubbernecked. You’re not like, ‘What the hell is going on? Why did we just stop in the middle of the road?’ Okay, it’s almost like it’s preplanned.” (*Id.*, 27943.)

**FEBRUARY 9, 2016 INTERROGATION WITH DEFENDANTS BUNCH, JACOBSON, AND EVERS**

aj) **Defendant Bunch**: “You weren’t there at all? Has someone gotten to you, Robert?...Meaning Baljit and Daljit or even Frank Carson or a representative of Frank Carson? Have they gotten to you?” (February 9, 2019, 25899.)

ak) **Defendant Bunch**: “Prior to the murder – prior to the murder, okay? You guys were talking in front of him, okay, about Frank’s property and how you were instructed to go find Korey Kauffman, okay, to make an example of out of him. That’s what you – that’s what your nephew said…” (*Id.*, 25903.)

Any reasonable police investigator would know that such leading and suggestive statements are contrary to reasonable police practices and would (and in this case, did) lead to false assertions by Woody in order to appease the investigators and avoid harsh penalties, including the death penalty.

50. On April 24, 2014, law enforcement gave Woody a polygraph test and he was asked whether he had anything to do with murder. He said no, and he passed the test.

However, Woody's false confession made him the state's only eye-witness to the alleged murder and the central piece of evidence in Defendants' criminal case against Mr. Carson, his wife and daughter, the Athwals, and three CHP officers. So, the defendants ignored the results of Woody's polygraph and continued to pursue their outlandish conspiracy against Carson. Existence of Woody's polygraph was not disclosed to Carson until 10-months into his preliminary hearing.

**MATERIAL OMISSIONS, FALSE AND MISLEADING STATEMENTS IN THE ARREST WARRANT**

51. On August 13, 2015, with no more evidence against Carson than Robert Woody's testimony which was unreliable and completely unbelievable, had repeatedly changed over time, and even contradicted the physical evidence in the case, Defendant **CORY BROWN** submitted a Ramey Warrant for Carson's arrest. The preparation of the arrest warrant affidavit was a joint effort that resulted in what Brown described in his deposition as a "group consensus" between himself and Defendants **FLADAGER, FERREIRA, BUNCH, EVERS** and **JACOBSON** on what charges to seek and what facts to include in the warrant. Plaintiffs are informed and believe and thereon allege that Defendants **FLADAGER, FERREIRA, HARRIS, EVERS** and **JACOBSON** reviewed the arrest warrant and knew it contained false statements and material omissions and was inherently misleading, yet all of them were party to giving the facts in the warrant to Defendant BROWN as part of their joint conspiracy to frame FRANK CARSON for murder. Defendants **FLADAGER, FERRERIA, HARRIS** and **BUNCH** ordered Defendant **BROWN** to submit the 325-page warrant to a judge, knowing that no judge would have time to carefully review the unorganized, rambling document. No reasonable law enforcement officer would have believed that the arrest warrant established probable cause for the arrest of Carson.

52. Pursuant to the Ramey warrant, on August 14, 2015, Frank Carson was falsely arrested and maliciously accused of being involved in an elaborate murder for hire scheme that resulted in the murder of Korey Kauffman. Not satisfied to simply try to take down Frank Carson, law enforcement maliciously went after his family as well. Georgia DeFilippo,

Carson's wife, and Christina DeFilippo, Georgia's daughter and Carson's stepdaughter, were also arrested for the murder.

53. Baljit Athwal and Daljit Athwal, owners of the Pop N Cork where Robert Woody worked, were also arrested and accused of murdering Kauffman based on the preposterous theory that they were monitoring Carson's property for thieves in exchange for Carson's representation of Woody in a minor criminal case. Three California Highway Patrol Officers, Scott McFarlane, Walter Wells, and Eduardo Quintanar who frequented the convenience store and were friends of the Athwals were also arrested for murder with special circumstances, conspiracy and accessory, respectively.

54. There are several significant material misstatements, misrepresentations, lies, fabrications and blatant omissions of exculpatory information in the search and arrest warrants that violated CARSON's Fourth Amendment rights as follows:

a. The arrest warrant indicates that Kaufman disappeared on March 30, 2012. This was not true, he disappeared on March 29, 2012. Kaufman's family put out fliers indicating that Kaufman disappeared March 29, 2012. Defendants knew this date was inaccurate but continued to use it as the date of disappearance because their junk cell phone expert, JIM COOK, gave opinions implicating Carson, CHP Officer Wells and the Athwals were in the vicinity of Carson's Turlock property on the night of March 30, 2012. This expert's testimony was later excluded from the criminal trial after he admitted under oath that the cell towers showed that the Athwals and Wells were never on the Carson property the night of March 30, 2012 and were at the Pop N Cork just as they always said they were.

b. The warrant alleges that Kauffman was going over the fence of Carson's property to steal metal pipes, but law enforcement knew there were never any evidence of pipes on Carson's property.

c. The warrant omitted the extreme coercion and improper tactics, such as contamination, employed to fabricate Robert Woody's statements as detailed above. Even though law enforcement fed Woody non-public facts of the murder, he never

provided any on his own, they falsely claimed in the warrant that he knew non-public facts about the crime.  No reasonable law enforcement officer would have believed that Woody's testimony established probable cause to arrest anyone, especially when it contradicted the physical evidence of the crime.

d.  The arrest warrant says Carson visited a witness named Ron Cooper in jail to solicit his "muscle" to help him with thefts on his property.  It was easily verifiable that Carson had never visited Cooper in jail, yet Defendants purposefully included this false information in the arrest warrant.

e.  The arrest warrant did not contain any information about the lack of credibility of the witnesses, including multiple contradictory statements by witnesses, especially Robert Woody's several different statements where he denied involvement altogether or said the Athwals hired a Mexican prison buddy to kill Kauffman (even though neither Athwal had ever been to prison).

f.  The warrant does not disclose that Robert Woody—the only alleged eyewitness—had no idea where the body was, even though he supposedly buried it.

g.  The warrant failed to inform the judge of grants of immunity or plea deals given to nearly every witness in exchange for their statements against Carson, including but not limited to, Robert Woody, Michael Cooley, his girlfriend Eula Keyes, her son, Keith Hobbs (who were given immunity or had their cases dropped for various drug crimes), Ron Cooper, Patrick Hampton (another career criminal who gave a statement that Carson tried to solicit him to watch over his property at the courthouse), and others.

h.  The warrant falsely states that "Investigators have **followed up on every lead** that has been brought to the attention regarding Kauffman going missing and being murdered to the best of their ability."  (Bold added.)  In fact, unbeknownst to the judge who signed the arrest warrant, **there were many suspects who had threatened to kill or harm Kauffman who were not investigated and who were not mentioned in the arrest warrant**.  One of those suspects had threatened to cut

Kauffman's throat "from ear to ear," 48 hours before Kauffman disappeared, but Defendants omitted that key information from the arrest warrant affidavit.

i. The warrant failed to inform the judge that drug dealers, McMillan and Armstrong, were seen on game cameras near where the body was found prior to public disclosure.

j. The warrant failed to inform the judge that Cooley admitted to witnesses that he was involved in Kauffman's murder.

k. The warrant did not disclose the Defendants' bias against Carson, including Carson's civil lawsuit against **JACOBSON** for assault, a jury tampering hearing against JACOBSON and **HARRIS**, and the accusations that Carson had made against BUNCH were never disclosed in any warrants.

l. Defendants made several false and misleading representations in the warrant to place Frank Carson and his wife and daughter in a negative light, including omitting an "LOL" from a text message that clearly indicated they were joking, misrepresenting Carson's interactions as an officer of the court, including falsely stating that Carson lied in a 911 call he made when Defendants trespassed at his law office and would not leave.

m. The warrant does not disclose what the affiant, **BROWN**, has recently admitted in deposition—that the cell phone tower expert's opinions are (at least in significant part) based on "**inherently misleading**" theories.

n. The warrant does not disclose another critical admission recently made by the affiant in deposition about Cook, the purported cell phone tower expert:  "**My limited understanding of how Jim Cook conducts his business is not consistent with the training that I've received**."  (Brown Deposition, June 24, 2021.)

o. **BROWN** admitted in deposition that Cook was the only source for the critical –  and false –  assertion in BROWN's arrest warrant affidavit that Baljit Athwal went to the "specific area" where the body was found.  But even Cook doesn't go that far. Indeed, **BROWN** testified that he does not recall where the "specific area" language

came from. In truth, there was never any evidence that Baljit Athwal was anywhere near the body and telling the Court that he was in the "specific area" where the remains were found is, as **BROWN** now admits, inherently misleading.

p. The warrant fails to disclose that at least three key witnesses mentioned in the affidavit (Mike Cooley, Eula Keyes, and Keith Hobbs) — the last people who saw Kauffman alive — were each found to be "deceptive" about their knowledge of Kauffman's disappearance when voice stress analysis tests were administered.

q. The warrant fails to disclose that Cooley also accused other people of being involved in the murder of Kauffman including Tina Carlos, Victor Altamirano, and Brandon Starr.

r. The warrant deliberately omitted any information about the physical evidence because Defendants knew that the physical evidence, including the fact that there was no blood, hair, clothing fibers, fingerprints, spit, sweat, or any such thing found on Mr. Carson's property where the Defendants claimed the murder occurred or at the Pop N Cork where Kauffman was allegedly buried, showed there was not probable cause to arrest Carson, or anyone else that was arrested, for murder.

55. There was never any evidence that a murder had occurred on Frank Carson's Turlock property. The only thing linking Frank Carson to the murder of Korey Kauffman was the statement of the career criminal, Robert Woody, who initially said he alone had murdered Kauffman. Woody's statement morphed into the ridiculous allegation that Kauffman was shot on Carson's Turlock property by one of the Athwals, who patrolled Carson's property in exchange for Carson representing Woody in a minor criminal case. This alleged gunshot was not heard by anyone in a neighborhood full of people and there was no blood, hair, clothing fibers, fingerprints, spit, sweat, or any such thing found on Carson's property.

**DEFENDANTS' WRONGFUL ACTS**

56. All of the defendants were involved in a conspiracy to violate Carson's constitutional rights, as well as a conspiracy to defame, falsely arrest, and maliciously prosecute him. Each of the defendants were involved in the malicious, retaliatory investigation and

prosecution and/or in furthering the goals of the conspiracy, which was to destroy the life and career of Frank Carson.

57. **Defendant BIRGIT FLADAGER:** Fladager ratified and condoned unconstitutional policies and decision-making in the District Attorney's office including the coercion of criminal defendants to give false statements against Carson in exchange for their cases being dropped or significantly reduced. Almost every witness that in any way implicated Frank Carson was a career criminal whose own criminal charges were dropped or significantly reduced in exchange for testimony against Carson. During the investigation Fladager among other things, personally:

a. Participated in regular briefings on the investigation.

b. Was intimately involved in approving the false and misleading arrest warrant to frame Frank Carson for murder and reviewed the final draft prior to submitting to the judge.

c. Supervised and knowingly condoned the intimidation and coercion of witnesses in order to create false evidence against Carson in furtherance of the conspiracy. Defendants Ferreira, Bunch, Jacobson, Evers, and Brown used unduly coercive interviewing techniques, such as prolonged interrogation, contamination (the feeding non-public information to the witnesses and then having the witness adopt that information), and used promises of leniency in the witnesses' own criminal charges in order to fabricate evidence against Carson.

d. Following the false and unlawful arrest, Fladager conducted a press conference where Carson was defamed and accused of being a murderer. For the first time in Stanislaus County history, the entire arrest warrant, including the personal identifying information and social security numbers of the accused, was posted online. Thereafter, two credit cards were opened in Frank Carson's name. This is clear evidence that Fladager was malicious in her arrest and prosecution of Carson and his family.

e. Prosecuted Carson for an accidental omission on election registration paperwork.

Fladager could not remember prosecuting another individual for that crime in her entire time as Stanislaus County District Attorney.

f. Acted outside her role as prosecutor and acted as supervisor, investigator and administrator. Defendant Fladager gave legal advice to investigators and police officers including advice that they had probable cause to search and arrest Carson, engaged in the planning, drafting and execution of search and arrest warrants based on evidence she knew was false, coerced and fabricated in order to search and to arrest Carson, and otherwise fully participated in and advised the officers and investigators throughout the investigation in which probable cause never existed to arrest Frank Carson. Fladager knew there was not probable cause to suspect Carson of any crime, yet she falsely and maliciously arrested and prosecuted him based on fabricated evidence.

58. **Defendant DAVID HARRIS:** Defendant Harris oversaw the entire investigation from its inception. Harris decided the investigation was a "blue star" confidential case that required specialized attention. Harris's role as supervisor was to "monitor and shepherd" the investigation to its conclusion. Harris ratified and condoned unconstitutional policies and decision-making in the District Attorney's office including the coercion of criminal defendants to give false statements against Carson in exchange for their cases being dropped or significantly reduced. Almost every witness that in any way implicated Frank Carson was a career criminal whose own criminal charges were dropped or significantly reduced in exchange for testimony against Carson. During the investigation Harris, among other things, personally:

a. Relayed updates directly to Fladager.

b. Participated in regular briefings on the investigation and was given additional briefings on any significant development.

c. Directly supervised Bunch, Jacobson and Brown.

d. Was informed of all witnesses law enforcement was interviewing.

e. Reviewed and edited all affidavits for wiretap applications.

f. Read all reports and transcripts of witness interviews.

g.  Approved the use of informants.

h.  Held meetings about the investigation with the heads of other involved law enforcement agencies.

i.  Attended a May 5, 2012 meeting with **FLADAGER** and Judge Cordova regarding wiretaps.

j.  Was intimately involved in drafting the false and misleading arrest warrant to frame Frank Carson for murder and reviewed the final draft prior to submitting to the judge.

k.  Supervised and knowingly condoned the intimidation and coercion of witnesses in order to create false evidence against Carson.  Defendants **BUNCH, JACOBSON, EVERS**, and **BROWN** used unduly coercive interviewing techniques, such as prolonged interrogation, contamination (the feeding non-public information to the witnesses and then having the witness adopt that information), and used promises of leniency in the witnesses' own criminal charges in order to fabricate evidence against Carson.

l.  Acted outside his role as prosecutor and acted as a supervisor, investigator and administrator.  Defendant **HARRIS** gave legal advice to investigators and police officers including advice that they had probable cause to search and arrest Carson, engaged in the planning, drafting and execution of search and arrest warrants based on evidence they knew was false, coerced and fabricated evidence in order to search and to arrest Carson, and otherwise fully participated in and advised the officers and investigators throughout the investigation in which probable cause never existed to arrest Frank Carson.  Harris knew there was not probable cause to suspect Carson of any crime, yet he falsely and maliciously arrested and prosecuted him based on fabricated evidence.

59.  **Defendant MARLISSA FERREIRA:** Ferreira took over for **HARRIS** in 2015 when he was accused of jury tampering by Frank Carson.  Ferreira ratified and condoned unconstitutional policies and decision-making in the District Attorney's office including the

coercion of criminal defendants to give false statements against Carson in exchange for their cases being dropped or significantly reduced. Almost every witness that in any way implicated Frank Carson was a career criminal whose own criminal charges were dropped or significantly reduced in exchange for testimony against Carson. During the investigation Ferreira, among other things, personally:

a. Participated in regular briefings on the investigation.

b. Directly supervised lead investigators including **BUNCH, JACOBSON** and **BROWN**.

c. Was informed of all witnesses law enforcement was interviewing.

d. Reviewed all affidavits for wiretap applications and addendums from June 2012 through 2015.

e. Reviewed and edited all affidavits for wiretap applications beginning 2015.

f. Read all reports and transcripts of witness interviews.

g. Was intimately involved in drafting the false and misleading arrest warrant to frame Frank Carson for murder and reviewed and approved the final draft prior to submitting to the judge.

h. Supervised and knowingly condoned the intimidation and coercion of witnesses in order to create false evidence against Carson and by extension, Plaintiffs. Defendants **BUNCH, JACOBSON, EVERS**, and **BROWN** used unduly coercive interviewing techniques, such as prolonged interrogation, contamination (the feeding non-public information to the witnesses and then having the witness adopt that information), and used promises of leniency in the witnesses' own criminal charges in order to fabricate evidence against Carson.

i. Used techniques that were so coercive and abusive that she knew, or was deliberately indifferent to the fact that those techniques would yield false testimony to criminally prosecute Carson, such as: (i) telling Beverly Woody her son Woody would get life in prison if their "stories" did not match; (ii) Conspiring with **JACOBSON** and **BUNCH** to allow Beverly Woody to pass notes to Robert

Woody out of the sight of security cameras while he was imprisoned, which told Robert Woody to implicate Carson, Walter Wells, and Plaintiffs in his in-court testimony, (iii) bringing Robert Woody to the location of Kauffman's remains while evidence flags showed the location to create the false impression that Woody knew where they body was and to support his false confession; (iv) met with **BUNCH, JACOBSON**, Woody, and Beverly Woody after court to discuss and plan Beverly Woody's fabricated testimony; and (v) ignoring Beverly Woody when Beverly Woody told Ferreira that she lied on the stand to help Woody.

j.  Supervised and knowingly condoned the intimidation and coercion of witnesses in order to create false evidence against Carson. Defendants Bunch, Jacobson, Evers, and Brown used unduly coercive interviewing techniques, such as prolonged interrogation, contamination (the feeding non-public information to the witnesses and then having the witness adopt that information) and used promises of leniency in the witnesses' own criminal charges in order to fabricate evidence against Carson.

k.  Helped create Jim Cook's inherently misleading maps by instructing him which points to include/represent on his maps and which to exclude.

l.  Acted outside her role as prosecutor and acted as a supervisor, investigator, and administrator. Defendant Ferreira gave legal advice to investigators and police officers including advice that they had probable cause to search and arrest Carson, engaged in the planning, drafting and execution of search and arrest warrants based on evidence they knew was false, coerced and fabricated evidence in order to search and to arrest Carson, and otherwise fully participated in and advised the officers and investigators throughout the investigation in which probable cause never existed to arrest Frank Carson. Ferreira knew there was not probable cause to suspect Carson of any crime, yet she falsely and maliciously arrested and prosecuted him based on fabricated evidence.

m.  Defendant **FERREIRA** committed the following acts while acting outside her

role as a prosecutor:

    i.    Ferreira and **BUNCH** went to visit a witness, TJ Singh, and told him not to sign a conflict waiver in order to deprive Carson's stepdaughter, Christina DeFilippo, of legal representation.

    ii.    Ferreira repeatedly asked when Carson's wife, Georgia, was going to run out of money for her defense and repeatedly told defense attorneys for Georgia and Christina that if they would give testimony implicating Carson in the crime, the charges against them would be dropped.  Georgia and Christina refused to do so, as it would have been a lie.

    iii.    Ferreira visited the owner of an antique mall and asked if Frank and Georgia ever sold guns, to which she was told no.  Ferreira never did a report on this and never disclosed it as Brady material.

    iv.    Ferreira acted as a primary investigator and participated in the interviews of witnesses and the fabrication of their testimony, including witness Ron Cooper who Carson allegedly solicited for his "muscle" to make an example of thieves on his property.

    v.    Ferreira accompanied Robert Woody to the location of Kauffman's remains while evidence flags showed the exact location to create the false impression that Woody knew where they body was and to support his false confession

60.    **Defendant KIRK BUNCH:**  As the lead case agent for the Stanislaus County District Attorney's Office, Bunch formed the team of investigators looking into Kauffman's disappearance, assigned tasks to other investigators on the task force, and oversaw the entire investigation.  Bunch was the first person to approach Defendant Harris about Carson's alleged involvement in Kauffman's disappearance.  Bunch made critical decisions throughout the investigation regarding who the task force considered a suspect or person of interest, when suspects or persons of interest were cleared, and which leads to pursue throughout the investigation.  In his position as the leader of the investigation, Bunch coordinated the wrongful acts of Defendants for the express purpose of securing a criminal conviction against Frank

Carson even though he knew there was no probable cause to charge them with murder or with being an accessory to murder. During the investigation Bunch among other things, personally:

a. Conducted approximately 400 witness interviews in which he used threatening and coercive statements to purposefully fabricate false evidence against Carson (See ¶¶ 44-50.)

b. Prepared, or participated in the preparation of arrest warrant that he knew or should have known contained numerous false or misleading statements and omissions that the reviewing judge would have found significant in deciding whether to issue the arrest warrant. For example, in the arrest warrant, Bunch included statements attributed to witness John Paden, who Bunch interviewed on 3/11/14. When the warrant was made public, Paden called Bunch and told him that Bunch was lying about what Paden had reported. Bunch replied, "Don't you want to help out a murder investigation?"

c. Prepared, or participated in the preparation of, the specific charges to be included in the arrest warrant for the murder of Korey Kaufman in a direct attempt to pressure the eight other innocent people accused of involvement in Kauffman's murder to manufacture false accusations against Frank Carson. Bunch included the murder charges and an enhancement for lying in wait in the arrest warrant specifically to hold Carson and others without bond in an attempt to secure a false confession against Carson or from Carson himself.

d. Used techniques that were so coercive and abusive that he knew, or was deliberately indifferent to the fact that those techniques would yield false testimony to criminally prosecute Carson, such as: (i) threatening Robert Woody with life imprisonment or the death penalty; (ii) reciting to Robert Woody what to say to secure a false confession that implicated Frank Carson, (iii) conspiring with **JACOBSON** and **FERRERIRA** to allow Beverly Woody to pass notes to Robert Woody out of the sight of security cameras while he was imprisoned, which told Robert Woody to implicate Carson, Walter Wells, and others in his

in-court testimony, (iv) holding group meetings with **MARLISA FERREIRA**, Beverly Woody, and Robert Woody at the Stanislaus County District Attorney's Office while Robert Woody was incarcerated to provide him with supposed facts for his in court testimony, (v) bringing Robert Woody to the location of Kauffman's remains while evidence flags showed the location to create the false impression that Woody knew where they body was and to support his false confession; and (vi) met with **FERREIRA, JACOBSON**, Woody, Beverly Woody after court to discuss and plan Beverly Woody's fabricated testimony.

e.  Personally and deliberately continued to investigate Carson and purposefully ignored exculpatory evidence and other suspects (including the suspects summarized in ¶ 44 of this Complaint). For example, Bunch interviewed witness Kimberly Stout, Kauffman's neighbor and childhood friend on 3/11/2014. Stout reported that Cooley told her that he was mad at Kauffman because he suspected Kauffman was having an affair with Cooley's girlfriend, Eula Keyes. Around the time Kauffman went missing, Keyes told Stout that Cooley, "set-up Kauffman" and then Keyes stopped coming over to Stout's house. Bunch also interviewed Edward Regua on May 13, 2014, and March 26, 2015. Regua reported seeing Kauffman getting into Tina Carlos' car the night Kauffman disappeared.

f.  Personally and deliberately continued to interview Robert Woody despite his inconsistent and contradictory statements because he understood that they did not have probable cause to charge Carson with murder and therefore desperately needed Woody's false confession to implicate him.

g.  Continued to hold regular briefings focusing the investigation on Carson, despite overwhelming exculpatory evidence. Since as early as April of 2012, when Deputy Kenneth Barringer first conducted interviews to investigate Kauffman's disappearance, Bunch ignored alternative theories and suspects (including the suspects summarized in ¶ 44 of this Complaint) for the express purpose of

securing a criminal conviction against Frank Carson.

h. Helped create Jim Cook's inherently misleading maps by instructing him which points to include/represent on his maps and which to exclude.

i. Destroyed the evidence on the game cameras showing McMillan was in the area where Kauffman's body was found.

j. At the preliminary hearing, Bunch disobeyed an order from the Court and improperly spoke with witness Linda Burns about her testimony.

61. **Defendant STEVE JACOBSON:** Jacobson was an investigator for the Stanislaus County District Attorney's Office. He was assigned by **HARRIS** to the task force investigating Kauffman's disappearance. He joined the murder investigation at its inception and improperly sought to secure a criminal conviction against Frank Carson even though he knew there was no probable cause to charge them with murder or with being an accessory to murder. Jacobson had a troubled 20-year long relationship with Carson, who had previously attacked Jacobson's professionalism, run an advertisement in a local paper seeking information about Jacobson's misconduct, sued him for assault, and sought contempt charges against Jacobson in another case. During the investigation Jacobson, among other things, personally:

a. Prepared, or participated in the preparation of arrest warrants for Plaintiffs that he knew or should have known contained numerous false or misleading statements and omissions that the reviewing judge would have found significant in deciding whether to issue arrest warrants.

b. Reviewed all the wiretap affidavits.

c. **BROWN** testified that it was a "joint decision" between **FLADAGER, FERREIRA, EVERS, BUNCH, JACOBSON**, and him to seek an arrest warrant for Carson for murder with special circumstances.

d. Prepared, or participated in the preparation of, the specific charges to be included in the arrest warrants against the eight other innocent people accused of involvement in Kauffman's murder to manufacture false accusations against Frank Carson. Jacobson included the murder charges and an enhancement for

lying in wait in the arrest warrant specifically to hold Carson and others without bond in an attempt to secure a false confession against Carson or from Carson himself.

e. Used techniques that were so coercive and abusive that he knew, or was deliberately indifferent, that those techniques would yield false testimony, such as: (i) arranging for Robert Woody's mother, Beverly Woody, to meet with him at the Stanislaus County District Attorney's Office while he was incarcerated without bail on charges for first degree murder to tell Robert Woody what investigators wanted him to say in court, (ii) pressuring and facilitating Beverly Woody to show Robert Woody, while he was in jail, a note telling him to implicate Frank Carson, Walter Wells, and Plaintiffs during his in-court testimony, (iii) instructing Beverly Woody how to position herself while she showed Robert Woody the note so that the video camera in the jail would not capture this exchange, (iv) threatening Robert Woody that he would "never…see [his] kids again except when they come visit [him] in jail" and not "be around" to "comfort [his] mother when she needs [him] the most" to garner a false confession, and (v) bringing Robert Woody to the location of Kauffman's remains while evidence flags showed the location to create the false impression that Woody knew where they body was and to support his false confession.

f. Met with **FERREIRA, BUNCH**, Woody, Beverly Woody after court to discuss and plan Beverly Woody's fabricated testimony.

g. During the preliminary hearing, Defendant Jacobson procured further false testimony from Robert Woody because there was no evidence that Frank Carson and CHP Officer Walter Wells were on Carson's property the night of the alleged murder. Woody had repeatedly told investigators that Carson had never asked them to hurt anyone stealing from his property. Defendant Jacobson had Robert Woody's mother, Beverly Woody, hold up a note to Robert Woody during a jail visit telling him they needed more implicating Carson and Wells.

Following this, Woody changed his story (yet again) and said Carson and Wells were on the property the night Kauffman was murdered. Woody recanted this statement several days later.

h. Personally and deliberately continued to investigate Carson and purposefully ignored exculpatory evidence and other suspects (including the suspects summarized in ¶ 44 of this Complaint).

i. Personally and deliberately continued to interview Robert Woody despite his inconsistent and contradictory statements because he understood that they did not have probable cause to charge Carson and Plaintiffs with murder and therefore desperately needed Woody's false confession to implicate them.

j. Deliberately prepared false or misleading reports that were used to charge and prosecute Plaintiffs. For example, in a report dated September 16, 2015, Jacobson claimed that Robert Woody's description of where Kauffman's remains were buried was "extremely accurate." However, when Woody purportedly took officers where the Kauffman remains were (they had already been located by police), Jacobson personally led Woody to the exact spot where officers had placed evidence flags and had Brown stand feet from the spot Kauffman's remains were found. This was done to create the knowingly false impression that Woody knew where the body was dumped. In fact, Woody had no idea where the body was, which is why Jacobson, **BUNCH, BROWN**, and the others who were present (including the **FERREIRA)** led Woody by the hand to the location where the body was found.

62. **Defendant JON EVERS:** Jon Evers started working on the investigation of Kauffman's disappearance at least as early as May 2012 and conducted over 400 hundred interviews in which he used threatening and coercive statements to purposefully fabricate false evidence against Carson. As the City of Modesto's sole Detective on the Kauffman investigation, Evers coordinated with Bunch and the County of Stanislaus District Attorneys'

Office daily to commit the violations alleged in this Complaint. Among other things, Evers personally:

a. Participated in fabrication of evidence from witness Scott Rollins by hiding evidence of Michael Cooley's motive to kill Korey Kaufman. Rollins knew that Cooley and Cooley's girlfriend's son, Keith Hobbs, were seen beating up Kauffman. Rather than investigate whether Cooley and Hobbs killed Kauffman, Defendant Evers solicited a false statement from Rollins that he had seen the Athwals in a fight with Kauffman. This shows the lengths the Defendants went to cover up credible leads to try to frame Carson and the Athwals for murder.

b. Spoke with Brown about the arrest warrant, knew it contained false and misleading statements and omissions, and did nothing to correct it.

c. Participated in the decision regarding what charges to pursue against Carson, including charging Carson with murder with special circumstances.

d. Participated in the decisions to rule out and not investigate the drug dealers and gang members who had threatened Korey Kauffman.

e. Used interview techniques that were so coercive and abusive that Evers knew, or was deliberately indifferent to the fact, that those techniques would yield false testimony. On March 1, 2014, Evers personally participated in an interview of Robert Woody in which he and Bunch recited to Robert Woody what to say to secure a false confession that implicated Frank Carson and Plaintiffs. Evers knew that Robert Woody had repeatedly denied any involvement in the murder and did not repeat part of the story being fed to him until after an unrecorded 20-minute bathroom break. Evers knew that the judge reviewing the arrest warrant affidavit would want to know about this information yet did not ask that it be disclosed.

f. Participated in the March 3, 2014, and February 6, 2016, interviews of Woody as Woody continued to change his story about how Kauffman died.

g.   Participated in bringing Robert Woody to the location of Kauffman's remains where evidence flags planted in the ground showed where Kauffman's body had been discovered to create the false impression that Woody knew where they body was and to support his false confession.

h.   Prepared, or participated in the preparation of, the specific charges to be included in the arrest warrants against the eight other innocent people accused of involvement in Kauffman's murder to manufacture false accusations against Frank Carson.

i.   **BROWN** testified that it was a "joint decision" between Evers, Bunch, Jacobson, and him to seek an arrest warrant for Carson for murder with special circumstances.  This was done to hold Carson without bond and to pressure Carson into falsely confessing to killing Kauffman.

j.   Continued to investigate Carson and purposefully ignored exculpatory evidence and other suspects (including the suspects summarized in ¶ 44 of this Complaint) to secure a criminal conviction of Frank Carson.  For example, Evers was present for the witness interview of Kimberly Stout on March 11, 2014 where she told investigators Cooley told her he was mad at Kauffman for having an affair with his girlfriend Eula Keyes.  Evers also interviewed Christa Mote on June 3, 2014 and March 14, 2015, where she reported overhearing Domenic Saldana say he disposed of Kauffman's body, wrapped in trash bags, using her car.

63.   **Defendant CORY BROWN**: Brown was the lead investigator from the Stanislaus County Sheriff's department on the task force investigating Kauffman's disappearance beginning in 2012.  Upon joining the task force, Brown familiarized himself with the existing evidence by reviewing all reports and speaking with investigators.  Brown became the affiant and manager of the wiretaps for Carson and the Athwals.  He also authored the arrest affidavit for Carson, Carson's wife, Carson's step-daughter, Baljit Athwal, Daljit Athwal, Walter Wells, Scott McFarlane, and Eduardo Quintanar.  Brown prepared the affidavits with assistance from the other investigators on the task force.  In addition to authoring the warrants,

Brown took the lead on many of the daily task force briefings. Through these acts, among others, Brown personally:

a. Signed the arrest warrant affidavit knowing that it contained numerous materially false and misleading statements, and blatant omissions of exculpatory information (including the suspects summarized in ¶ 44 of this Complaint). For example, Brown failed to inform the Court that critical cell phone tower data was "**inherently misleading**." Brown also recently admitted in deposition: "**My limited understanding of how Jim Cook conducts his business is not consistent with the training that I've received**." Yet, none of this was disclosed to the Court in Brown's critical arrest warrant affidavit.

b. Brown failed to disclose in the search warrant affidavit the many suspects who had recently threatened to kill Kauffman.

c. The affidavit fails to disclose that at least three key witnesses mentioned in the affidavit (Mike Cooley, Eula Keyes, and Keith Hobbs)—the last people who saw Kauffman alive—were each found to be "deceptive" about their knowledge of Kauffman's disappearance when voice stress analysis tests were administered. Brown knew this because he was present during the tests and reported on the results. He had no explanation in deposition for why he failed to disclose this critical information.

d. Prepared, or participated in the preparation of, the specific charges to be included in the arrest warrants against the eight other innocent people accused of involvement in Kauffman's murder to manufacture false accusations against Frank Carson.

e. **BROWN** testified that it was a "joint decision" between himself, **FLADAGER, FERRIERA**, **EVERS, BUNCH,** and **JACOBSON** to seek an arrest warrant for Carson for murder with special circumstances.

f. Deliberately continued to investigate Carson and purposefully ignored exculpatory evidence and other suspects (including the suspects summarized in ¶

44 of this Complaint). For example, **BROWN** interviewed Charlie Odell on February 8, 2013. Odell reported encountering Cooley covered in mud after disposing Kauffman's body and that Cooley confessed to Kauffman's murder. That same day, **BROWN** interview Keith Hobbs who also said Cooley told him he was involved in Kauffman's murder. Additionally, Brown continued to investigate Carson even though the wiretaps on cell phones were terminated early when no pertinent evidence was collected and ignored, what he later described as a reasonable inference, that Kauffman may have left the Carson property the night he was last seen after stealing pipes from Carson's property because the wheelbarrow he arranged to be dropped off near Carson's property was gone.

g. Used techniques that were so coercive and abusive that he knew, or was deliberately indifferent, that those techniques would yield false testimony, such as bringing Robert Woody to the location of Kauffman's remains while Brown stood near where the remains were found and evidence flags showed the location to create the false impression that Woody knew where they body was and to support his false confession.

h. Brown failed to inform the Court in his arrest warrant affidavit that Woody—the only purported eyewitness and one of the two people who supposedly buried Kauffman where his remains were found—had no clue where the body was, or how to get there. Indeed, he recently admitted in deposition that "we didn't receive any information from Woody on how to get to the site where Kauffman's remains were found" because Woody "didn't know how to get there." Thus, when Brown drove Woody to where Woody was supposed to show them where the body was buried, Woody didn't show them anything. Instead, Brown used GPS to find the road where authorities had located the body and led Woody to a specific location where police evidence flags were stationed in advance of Woody's visit. The site visit was a charade, and Defendants knew it.

## V. CONCLUSION

64. The theory pursued by law enforcement to frame Frank Carson for murder was so outlandish that no reasonable person would have believed it to be true. The Defendants in this case ignored all the real suspects who actually had a motive to kill Korey Kauffman, including several career criminals like Michael Cooley and drug dealers Jason Armstrong and David McMillan, and pursued a preposterous conspiracy theory that a well-respected attorney engaged two local business owners to murder someone and then engaged three California Highway Patrol Officers, his wife and stepdaughter to help cover it up. It was alleged that the local business owners, the Athwal brothers, who had no criminal history, murdered Korey Kauffman for Carson in exchange for him to represent their employee in a stolen property case. This simply makes no sense and how any prosecutor or police officer pursued this scheme with a straight face is bewildering. The Carson family did not know any of the CHP officers that allegedly helped cover up the crime, didn't know Daljit Athwal even existed, and were only barely acquainted with Baljit Athwal. This alleged conspiracy was based solely on the statement of a drug addicted felon, Robert Woody, and it all started because Woody was trying to impress a girl by saying that he alone had killed Kauffman. Defendants then used their authority under state law to coerce Mr. Woody to incriminate Frank Carson. Their theory that Carson committed murder for hire was nothing short of delusional and therein lies the proof of the malicious, unconscionable and fraudulent nature of what the Defendants have done.

65. On June 28, 2019, Frank Carson and the Athwal brothers were acquitted of all charges by a jury after less than two days of deliberations. Following the trial, Defendants from the Stanislaus County DA's Office further defamed Carson in the press by continuing to accuse him of being involved in a murder due to the thefts of scrap metal on his property.

## VI. DAMAGES

66. The Estate of Frank Carson suffered enormous economic damages including lost income to and reputational damage his law practice. The Estate also has significant legal fees for Mr. Carson's criminal defense. Mr. Carson served seventeen (17) months in jail. His health deteriorated due to the conditions of the jail. The jail was closed for inhumane conditions just

months after Carson was released. He suffers from high blood pressure, went into kidney failure and had to be on dialysis. On August 12, 2020, Mr. Carson passed away as a result of complications from diabetes and high blood pressure due to these conditions being uncontrolled while he was in jail.

67. Georgia DeFilippo was married to Frank Carson at the time of his death. Ms. DeFilippo relied on Frank Carson for his love, companionship, comfort, society, affection, solace, and moral support. Georgia DeFilippo also suffers from significant economic losses as a result of Frank Carson's death and the loss of his law practice as a result of his death. As a direct result of Mr. Carson's death, Ms. DeFilippo suffered and continues to suffer damages, including but not limited to loss of their shared income, financial losses related to the closing of the law firm, funeral expenses, and general damages related to the loss of Frank Carson's love, companionship, comfort, affection, society, solace and moral support.

## FIRST CAUSE OF ACTION
## 42 U.S.C. § 1983 for Fourth Amendment Violations
## Unlawful Search and Seizure/Judicial Deception
## [Estate of Carson Against Fladager, Harris, Ferreira, Bunch, Brown, and DOES 1-25]

68. Plaintiffs incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

69. In doing the acts complained of herein, Defendants, and/or each of them, acted under color of law to deprive Plaintiff of certain constitutionally protected rights, including, the right to be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment to the Constitution of the United States and the right to be free from arrest without probable cause guaranteed by the Fourth Amendment to the Constitution of the United States.

70. Defendants **BUNCH** and **BROWN** presented search warrants and arrest warrants that were so clearly lacking in probable cause that any reasonable officer would have known that they did not have probable cause to search or seize Plaintiff. Defendants **FLADAGER**, **HARRIS**, and **FERREIRA** each reviewed and/or edited and approved the search and arrest warrants.

71. On information and belief, Defendants **FLADAGER**, **HARRIS**, and

**FERREIRA** knew about and approved of or ratified the illegal searches and seizures that resulted in the deprivation of Plaintiff's constitutional rights.

72. As set forth in detail above, Defendants **BUNCH** and **BROWN** intentionally or in reckless disregard of the truth made one or more fabrications, material misrepresentations or omissions in a search warrant affidavit submitted to a judge. As set forth in paragraphs 38, 45-50 & 63, **BROWN** made false and misleading statements and omitted material exculpatory evidence. As set forth in paragraph 60, **BUNCH** was the lead investigator on the case. He supervised the drafting of the warrant and assisted in authoring its contents. **BUNCH** actively participated in including the false and misleading statements and omissions by failing to inform **BROWN** of the blatant inaccuracies and deficiencies.

73. Defendants **FLADAGER**, **HARRIS**, and **FERREIRA** were acting as supervisors of **BUNCH** and **BROWN** and either directed their subordinates to submit these deceptive warrants, and/or failed to intervene to stop their subordinates from violating Plaintiffs' constitutional rights. As set forth in paragraphs 57-59, Defendants **FLADAGER**, **HARRIS** and **FERREIRA** reviewed the arrest warrant. **FLADAGER** personally edited the arrest warrant. Defendants **FLADAGER**, **HARRIS** and **FERREIRA**'s conduct was so closely related to the constitutional deprivations as to be the moving force behind the violations of constitutional rights.

74. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Estate of Carson has suffered damages, including, but not limited to, legal expenses and economic losses.

75. In doing the things alleged herein, the Defendants' conduct was despicable. The Individual Defendants acted toward Plaintiffs with malice, oppression, fraud, and with willful and conscious disregard for Plaintiffs' rights, entitling them to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 for Fourth Amendment Violations**
**Malicious Prosecution in Violation of the Fourth Amendment**
**[Estate of Carson Against Defendants Fladager, Harris, Ferreira, Bunch, Jacobson, Evers, Brown, and DOES 1-25]**

76. Plaintiffs incorporate by reference and reallege each and every allegation set

forth above, as though fully set forth herein.

77. In doing the acts complained of herein, **FLADAGER**, **HARRIS**, **FERREIRA**, **BUNCH**, **JACOBSON**, **EVERS**, **BROWN**, and DOES 1-25, inclusive, and/or each of them, acted under color of law to deprive Plaintiffs of certain constitutionally protected rights, including, but not limited to, the right to be free from arrest and prosecution without probable cause guaranteed by the Fourth Amendment to the Constitution of the United States.

78. Defendants were actively involved in causing the initiation of criminal proceedings against Plaintiffs without probable cause and with malice and reckless indifference.

79. As set forth in paragraphs 57-59, Defendants **FLADAGER**, **HARRIS**, and **FERREIRA** supervised the entire malicious investigation that led to the malicious prosecution. As supervisors, they were briefed regularly on the status of the investigation, participated in witness interviews, read police reports – including exculpatory witness statements, and reviewed and/or edited the arrest warrant that contained numerous false/misleading statements and omissions of exculpatory information. They provided legal advice regarding probable cause for, and approved, Plaintiffs' arrest. They approved and/or ratified the charges included against Carson and the eight other innocent individuals accused of murdering Kauffman knowing the result of the charges would be imprisonment without bail.

80. As set forth in paragraph 59, **FERREIRA** acted outside her role as prosecutor and instead acted as an investigator.

81. In a July 2017 email, **FERREIRA**, acting as a supervisor and co-conspirator, gave **BUNCH** "unfettered authority" to decide what discovery should go out to the defense and when knowing that BUNCH would use that authority to destroy or withhold exculpatory evidence from the Defense.

82. The criminal proceedings were terminated in Plaintiff's favor.

83. As set forth in paragraphs 35-36 and 60-63, Defendants **BUNCH**, **JACOBSON**, **BROWN**, and **EVERS**, all participated in drafting the arrest warrant that contained numerous false/misleading statements and omissions of exculpatory information.

84. As set forth in paragraphs 45-50, Defendants **BUNCH**, **JACOBSON,** and

**EVERS** participated in obtaining the coerced confession from Robert Woody.

85. As set forth in paragraphs 59-63, Defendants **FERREIRA**, **BUNCH**, **JACOBSON**, **EVERS**, and **BROWN** participated in leading Woody to the location the Kauffman remains were found to further support his false confession for the express purpose of convicting Carson of murder.

86. No reasonable person would have believed that there were grounds for Plaintiff to be arrested or prosecuted and Defendants, by their conduct, intended to deprive Plaintiff of his constitutional right to be free from unreasonable seizures under the Fourth Amendment.

87. As set forth in paragraphs 57-59, Defendants **FLADAGER**, **HARRIS**, and **FERREIRA** are sued in their capacity as administrators, supervisors and investigators, for their acts alleged above and not for any acts in their roles as prosecutors in the presentation of the state's case against Carson.

88. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Estate of Carson has suffered damages, including, but not limited to, legal expenses and economic losses.

89. In doing the things alleged herein, Defendants' conduct was despicable. Defendants acted toward Plaintiff with malice, oppression, fraud, and with willful and conscious disregard for Plaintiff's rights, entitling him to an award of punitive damages.

## THIRD CAUSE OF ACTION
**42 U.S.C. § 1983 for First and Fourth Amendment Violations**
**Retaliatory Prosecution in Violation of the First and Fourth Amendment**
**[Estate of Carson Against Defendants Fladager, Harris, Ferreira, Bunch, Jacobson, Evers, Brown and DOES 1-25]**

90. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91. In doing the acts complained of herein, **FLADAGER**, **HARRIS**, **FERREIRA**, **BUNCH**, **JACOBSON**, **EVERS**, **BROWN,** and Does 1-25, inclusive, and/or each of them, acted under color of law to deprive Plaintiff of certain constitutionally protected rights, including, but not limited to, Plaintiff's First amendment rights to engage in constitutionally protected activities without fear of being criminally charged without probable cause, the right to

be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment to the Constitution of the United States. The right to be free from arrest without probable cause guaranteed by the Fourth Amendment to the Constitution of the United States.

92. As described in detail above, Defendants caused the initiation of criminal proceedings against Plaintiff without probable cause and with malice and reckless indifference and in retaliation for the constitutionally protected activities of their family member Frank Carson as a lawyer and public advocate against corruption of law enforcement.

93. As set forth in paragraphs 35-36, 42, and 57-63, Defendants each had motive to pursue this retaliatory prosecution. In addition to winning high profile cases against FLADAGER, he ran against her as DA in 2014, exposing her abuses of power. FLADAGER was known to gather attorneys and investigators at the DA's office with the goal of assembling information to use against Carson and have him disbarred. Additionally, Carson filed a complaint against HARRIS with the California Bar Association, filed court declarations against BUNCH accusing him of being a liar, and was engaged in a civil suit against JACOBSON for assault during the Kauffman investigation.

94. The criminal proceedings were terminated in Plaintiff's favor.

95. Defendants **FLADAGER**, **HARRIS**, and **FERREIRA** are sued in their capacity as administrators, supervisors and investigators, for their acts alleged above, and not for any acts in their roles as prosecutors in the presentation of the state's case against Carson.

96. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Estate of Carson has suffered damages, including, but not limited to, legal expenses and economic losses.

97. In doing the things alleged herein, Defendants' conduct was despicable. Defendants acted toward Plaintiff with malice, oppression, fraud, and with willful and conscious disregard for Plaintiff's rights, entitling them to an award of punitive damages.

## FOURTH CAUSE OF ACTION
**42 U.S.C. § 1983 for Fourteenth Amendment Violations**
**[Estate of Carson Against Defendants Fladager, Harris, Ferreira, Bunch, Jacobson,**

**Evers, Brown, and DOES 1-25]**

98. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99. In doing the acts complained of herein, **FLADAGER, HARRIS, FERREIRA, BUNCH**, **JACOBSON**, **EVERS**, **BROWN**, and DOES 1-25, inclusive, and/or each of them, acted under color of law to deprive Plaintiffs of certain constitutionally protected rights, including, but not limited to, Plaintiffs' First amendment rights to engage in constitutionally protected activities without fear of being criminally charged without probable cause, the right to be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment to the Constitution of the United States. The right to be free from arrest without probable cause guaranteed by the Fourth Amendment to the Constitution of the United States and the right to due process of law by being informed of all exculpatory evidence in the criminal case against Plaintiffs guaranteed by the Fourth and Fourteenth Amendments of the Constitution of the United States.

100. The circumstances as set forth above clearly indicated to Defendants that further investigation was warranted and there was a lack of probable cause to arrest Plaintiffs.

101. Defendants **BUNCH**, **JACOBSON**, **EVERS**, **BROWN**, and DOES 1-25, failed to disclose highly exculpatory evidence to prosecutors even though they knew or should have known or acted with reckless disregard for the fact that withholding such evidence would result in constitutional deprivations of the Plaintiff. In 2016, more than one year after Plaintiff's arrest and ten months into the preliminary hearing, Defendant **BUNCH** and **FERREIRA** turned over 53 discs of previously undiscovered investigative materials, including scores of exculpatory evidence. This was done just before a new law came into effect that would have made such a withholding a felony. Among this evidence was a polygraph test given to Woody in April 2014 that showed he was being truthful when he denied involvement in the Kauffman murder. **BUNCH** installed and monitored game cameras where Kauffman's remains were found. Drug dealers McMillan and Armstrong were captured on the camera, but footage was deleted withheld from Carson's counsel. In a July 2017 email, **FERREIRA** gave **BUNCH** "unfettered

authority" to decide what discovery should go out to the defense and when.

102. Defendants **FLADAGER**, **HARRIS**, and **FERREIRA** were acting as supervisors and investigators when this exculpatory evidence was withheld.

103. Plaintiff Carson spent 17 months in jail before being released based on prosecutorial misconduct and nearly 4 years charged with murder until he was acquitted by a jury.

104. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Estate of Carson has suffered damages, including, but not limited to, legal expenses and economic losses.

105. In doing the things alleged herein, Defendants' conduct was despicable. Defendants acted toward Plaintiff with malice, oppression, fraud, and with willful and conscious disregard for Plaintiff's rights, entitling them to an award of punitive damages.

## FIFTH CAUSE OF ACTION
## VIOLATION OF CIVIL RIGHTS FOR UNCONSTITUTIONAL CUSTOM OR POLICY, 42 U.S.C. §§ 1983, 1988
## [Estate of Carson Against Defendant Stanislaus County, Fladager and Harris]

106. Plaintiffs hereby realleges and incorporates each and every allegation set forth above as though fully set forth herein.

107. Under the First and Fourth Amendment to the United States Constitution, Plaintiff had a right to be free from unreasonable searches and seizures and retaliatory prosecutions by law enforcement. Under the Fourteenth Amendment to the United States Constitution, Plaintiff had a right not to be deprived of life or liberty without due process of law including, but not limited to, unreasonable seizures and searches.

108. Defendants were final policymakers for Stanislaus County and engaged in a malicious and retaliatory arrest and prosecution of Plaintiff and those acts constitute final constitutional policies of the **COUNTY OF STANISLAUS**.

109. As set forth in paragraphs 57-59, Defendants **FLADAGER**, **HARRIS**, and **FERREIRA** ratified the conduct of their subordinates and they made deliberate choices to consciously disregard the constitutional rights of Plaintiff to pursue a course of retaliatory and

malicious prosecution without probable cause. Defendants were regularly briefed on the status of the investigation, reviewed/edited search and arrest warrants, reviewed police reports – including exculpatory witness statements, and condoned witness coercion.

110. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Estate of Carson has suffered damages, including, but not limited to, legal expenses and economic losses.

**SIXTH CAUSE OF ACTION**
**Violation of California Civil Code section 52.1**
**[Estate of Carson Against All Defendants]**

111. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112. As set forth in paragraphs 57-59, Defendants **FLADAGER, HARRIS** and **FERREIRA** ratified the conduct of their subordinates and they made deliberate choices to consciously disregard the constitutional rights of Plaintiff to pursue a course of retaliatory and malicious prosecution without probable cause.

113. As set forth in paragraphs 38 and 45-50, Plaintiff alleges that the Defendants made material fabrications and misstatements to a court in order to secure Plaintiff's arrest, withheld exculpatory evidence from prosecutors, and caused the initiation of a malicious criminal prosecution against them in violation of their First, Fourth and Fourteenth Amendment rights under the United States Constitution and corresponding rights under the California Constitution.

114. As set forth in paragraph 44-50, Defendants **BUNCH, JACOBSON** and **EVERS** used threats and coercive interview tactics to secure false statements from witnesses with the intent to deprive Carson of his constitutional rights.

115. Plaintiff was subjected to threats, intimidation and coercion that was independent from the threats, intimidation and coercion inherent in any arrest and detention.

116. Defendants **COUNTY OF STANISLAUS** and **CITY OF MODESTO** are liable under a theory of respondent superior.

117. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff

Estate of Carson has suffered damages, including, but not limited to, legal expenses and economic losses.

118. In doing the things alleged herein, the individual defendants' conduct was despicable. The individual defendants acted toward Plaintiffs with malice, oppression, fraud, and with willful and conscious disregard for Plaintiffs' rights, entitling them to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**False Arrest/Imprisonment**
**[Estate of Carson Against All Defendants]**

119. Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

120. The defendants and Does 1-25, and/or each of them, by their actions caused Plaintiff to be confined or knew to a substantial certainty that Plaintiff would be confined due to their actions.

121. As set forth in paragraphs 38, 51-54 and 57-63, the defendants were instrumental in causing Plaintiff to be arrested and/or made material misrepresentations and omissions in the arrest warrant that they knew would cause the judge to issue a warrant that was not supported by probable cause.

122. California Government Code section 820 provides that a public employee is liable for injury to the same extent as a private person.

123. California Government Code section 820.4 specifically provides that a public employee is liable for false arrest or false imprisonment.

124. California Government Code section 815.2 provides that a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his/her employment. Defendants **COUNTY OF STANISLAUS** and **CITY OF MODESTO** are liable under a theory of respondent superior.

125. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Estate of Carson has suffered damages, including, but not limited to, legal expenses and economic losses.

126.     In doing the things alleged herein, the defendants' conduct was despicable.  The defendants acted toward Plaintiff with malice, oppression, fraud, and with willful and conscious disregard for Plaintiffs' rights, entitling them to an award of punitive damages.

**EIGHTH CAUSE OF ACTION**
**Wrongful Death**
**42 U.S.C. § 1983 for First, Fourth and Fourteenth Amendment Violation**
**CA CCP § 337.60, et seq.**
**[Georgia DeFilippo Against All Defendants]**

127.     Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

128.     As a direct and proximate result of the wrongful acts alleged above, Frank Carson suffered from deleterious effects to his health conditions, including complications due to uncontrolled diabetes and complications from high blood pressure.  The conditions of Carson's incarceration caused his health to deteriorate and ultimately caused his death on August 12, 2020.

129.     All of the Defendants caused or set in motion a series of events leading to Carson's false arrest, malicious and retaliatory prosecution resulting in constitutional deprivations which ultimately led to Carson's death.

130.     Pursuant to Government Code sections 815.2, COUNTY OF STANISLAUS and CITY OF MODESTO are vicariously liable for the conduct of the individual Defendants who were acting within the course and scope of their employment.

131.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Georgia DeFilippo has suffered damages, including but not limited to loss of financial support from Frank Carson, funeral expenses, compensation for the loss of Mr. Carson's love, companionship, comfort, affection, society, solace, and moral support.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Estate of Frank Carson and Georgia DeFilippo pray for judgment against defendants County Of Stanislaus, City Of Modesto, Birgit Fladager, David Harris, Marlissa Ferreira, Kirk Bunch, Steve Jacobson, Jon Evers, and Cory Brown requesting entry of judgment as follows:

A. For general damages in an amount to be determined at trial;

B. For special damages in an amount to be determined at trial;

C. For punitive damages against the individuals in an amount to be determined at trial;

D. For costs of suit and reasonable attorneys' fees pursuant to 42 U.S.C. section 1988 and other relevant statutes, including a contingency fee enhancement beyond the lodestar;

E. For prejudgment interest at the legal rate; and

F. For such other and further relief as the court deems just and proper.

DATE: November 18, 2021

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER

/s/ *Angelina M. Austin*

J. Gary Gwilliam
Randall E. Strauss
Jayme L. Walker
Angelina M. Austin
Attorneys for Plaintiff
ESTATE OF FRANK CARSON &
GEORGIA DEFILIPPO

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

DATE: November 18, 2021

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER

/s/ *Angelina M. Austin*

J. Gary Gwilliam
Randall E. Strauss
Jayme L. Walker
Angelina M. Austin
Attorneys for Plaintiffs
ESTATE OF FRANK CARSON &
GEORGIA DEFILIPPO